|,LEON A. CANNIZZARO, JR., Judge.
The State of Louisiana indicted two brothers, Roland and Larry Adams, on a charge of second degree murder, a violation of La. R.S. 14:30.1[1], in connection with the shooting death of Terrell Lamp-ton. Both men pled not guilty at their arraignments. After they were tried together before a jury, Roland Adams was found guilty as charged, and Larry Adams was acquitted. Roland Adams was sentenced to life imprisonment in accordance with La. R.S. 14:30.1(B).[2] He is now appealing his conviction.[3]
STATEMENT OF FACTS
On July 17, 2003, at 11:46 p.m., a 911 dispatcher received a call. The caller reported that he had witnessed a shooting in the 1400 block of Deslonde Street in New Orleans. He also stated that he had followed the white van in which the |2perpetrators fled until he saw police officers stop the van and handcuff its two occupants just a few minutes after the shooting. Several other people also called 911 within minutes to report the shooting.
New Orleans Police Department (“NOPD”) Officer Floyd Jackson testified at the trial of the two individuals who had been in the white van the night of the shooting. Officer Jackson stated that on the night of the shooting, he and his partner, NOPD Officer Precious Davis, went to 1407 Deslonde Street in response to a report that a person was discharging a weapon or was shooting fireworks at that location. While they were en route to the *9 scene, the officers received reports on the police radio channel that a white van was observed fleeing the scene, that the white van had been stopped by police, and that someone had been shot.
When Officers Jackson and Davis arrived in the 1400 block of Deslonde Street, they found a man, who had sustained multiple gunshot wounds, slumped over in the driver’s seat of a white Oldsmobile station wagon. The person was totally unresponsive, and he was later pronounced dead. After the officers reached the scene, they immediately cordoned off the area and maintained the integrity of the scene until both emergency medical services and the lead detective arrived.
NOPD Officer Desmond Julian testified at the trial that he and his partner, NOPD Officer Alan Bartholomew, were responding to a call unrelated to the Deslonde Street shooting when they heard several shots. They then proceeded to drive in the direction of the shots. They also heard a broadcast on the police radio channel advising that someone had been shot and that the perpetrators were in a white van. As they were driving to the area where the shots were fired, Officers Julian and Bartholomew saw a white van about a block away. The officers then |3drove to the area where they saw the van, drove up behind the van, and activated the flashing lights and siren on their police car. The van then stopped.
Officers Julian and Bartholomew asked the occupants of the van to show their hands and exit the vehicle. Larry Adams exited the van on the driver’s side, and Roland Adams exited from the passenger side. Both men were handcuffed and placed near the police car. Officer Julian then began to look inside the van for a gun, and Officer Bartholomew searched the brothers’ names on the computer in the police car. When Officer Julian did not find a gun in the car, he assumed that the gun had been tossed out of the van. He then began walking in the area searching for a gun on the sides of the street and in the neighboring yards.
After he failed to find the gun, Officer Julian returned to the van. He leaned over the driver’s seat to get a better view of the van’s interior, and as he did so, he fell and his arm hit a center console, which was not attached to the vehicle. When Officer Julian’s arm hit the console, the console shifted in such a way that the handle of a gun was then visible.
Officer Julian retrieved the gun and contacted the lead detective on the case, NOPD Sergeant Gregory Hamilton, who told him to leave the gun in the van. Shortly after Officer Julian found the gun, Detective Hamilton arrived at the scene where the van was being detained, and he told Officer Julian to have the van taken to the evidence cage at police headquarters. When the tow truck arrived to take the van to the evidence cage, Officers Julian and Bartholomew took the Adams brothers to the police station where they were separately questioned. Later both men were taken to police headquarters where they were booked and incarcerated.
After Officer Julian testified at the trial, Officer Bartholomew testified. Officer Bartholomew’s testimony conformed to that of Officer Julian.
| ¿Crayton Turner, who had called 911 to report that he had witnessed the shooting and the fleeing of the perpetrators in a white van, was called to testify at the trial. Mr. Turner testified that he lived on Des-londe Street and that he had returned home after work between 11:00 and 11:30 p.m. the night of the shooting. He parked his car in front of his residence, which was the second house from the scene of the shooting, and remained in the car listening *10 to gospel music. While he was listening to the music, he heard what he thought were fireworks.
When he heard the sound of fireworks, he got out of his car and saw a man standing with a gun in his hand, and he saw fire coming out of the barrel of the gun. Mr. Turner said that he heard two shots and then saw eight to ten additional shots being fired. Mr. Turner immediately called 911 on his cell phone while the shooting continued. He even asked the dispatcher to whom he spoke whether she could hear the gunshots in the background.
Mr. Turner also testified that he saw a white van parked behind the vehicle that was parked in the driveway where the shooting was taking place. After Mr. Turner saw the man firing the shots, he then saw the man calmly walk around the rear of the white van and get in the front passenger seat. While Mr. Turner was still talking to the 911 dispatcher, he saw the white van leave the scene of the shooting.
Mr. Turner then told the dispatcher that he was going to follow the van and get its license number. Mr. Turner remained on the 911 call with the dispatcher while he followed the white van, and when he saw the van again he told the dispatcher “that’s the guys right there.” Mr. Turner subsequently saw that the police had stopped the van. When he returned to his residence on Deslonde Street, |Khe told a police officer that he could give the police information regarding the shooting. A week or two later he gave a formal statement to the police.
Mr. Turner also testified that he saw a difference in the complexions of the two men in the van that he followed. He said that the man with the gun had a darker complexion than the driver of the van. Finally, Mr. Turner confirmed that he had reported that the man firing the gun had reached into the back seat of the vehicle in which the victim was shot and retrieved a package “maybe six by six inches.”
After Mr. Turner testified, Mildred Lampton, the mother of the victim, testified that an officer at the scene of the shooting showed her two cell phones. She identified one of the cell phones as her phone, but she did not know whose phone the other one was.
NOPD Detective Gregory Hamilton testified that he was the lead detective assigned to investigate the shooting on Des-londe Street. He was responsible for taking control of the crime scene and collecting evidence.
Detective Hamilton stated that two cell phones were recovered from the crime scene. One cell phone was found on the floorboard of the station wagon in which the victim had been shot, and the other cell phone was found just outside the door of the station wagon. Detective Hamilton’s investigation revealed that the cell phone found inside the station wagon belonged to the victim’s mother, Ms. Lamp-ton. She had never seen the other cell phone, however. Detective Hamilton testified that once Roland and Larry Adams were detained, he found that Larry Adams had a cell phone in which the telephone number of the second cell phone found at the crime scene was stored. The number was stored under the name “Roland.” Detective Hamilton also noticed that although Roland Adams did not [ fihave a cell phone with him when he was being interviewed at the police station, he was wearing an empty cell phone holder.
Detective Hamilton identified the gun that was submitted into evidence at the trial as the gun that was removed from the white van pursuant to a search warrant that he obtained after the van was taken to *11 the evidence cage at police headquarters. Detective Hamilton also identified evidence collected during the search of the white station wagon in which Mr. Lampton was killed.
Dr. Paul McGarry, a forensic pathologist, testified that he performed an autopsy on the victim’s body. Mr. Lampton’s body had eighteen gunshot wounds. There were at least two fatal wounds, one in which the spinal cord was severed and one in which the heart was penetrated. Dr. McGarry recovered six nine-millimeter bullets from Mr. Lampton’s body.
NOPD Officer Kenneth Leary, an expert in firearms identification and examination, testified that the gun recovered from the white van was a Glock nine-millimeter semi-automatic handgun with a seventeen-shot magazine and a laser scope. Officer Leary had test fired a bullet from that gun, and he had compared the markings on the test bullet casing to the bullet casings recovered from the ground next to the station wagon in which Mr. Lampton was shot and from the interior of the station wagon. He also compared the markings on the test bullet to four of the bullets removed from Mr. Lampton’s body during an autopsy. Officer Leary concluded that all of the bullet casings and four of the bullets recovered from Mr. Lampton’s body were fired from the gun that was removed from the white van. Officer Leary was unable to determine the origin of another bullet recovered from the victim’s body and several bullet fragments that were found, because the condition of the specimens were unsuitable for making a definitive determination. |7 Officer Leary also explained that the laser sight on the gun was usually used at night to locate a target.
Ashley Mitchell, Larry Adams’ former girlfriend, testified that she was at her grandmother’s house on the night of the shooting. At approximately 11:37 p.m., she received a telephone call from Larry Adams, who was sitting in the white van outside of her grandmother’s house. She went outside and visited with Larry Adams for a few minutes. She said that Roland Adams was sitting in the van’s front passenger seat and that Larry Adams was in the driver’s seat. Ellen Smith, Ms. Mitchell’s grandmother, then testified that she answered a telephone call from Larry Adams at approximately 11:37 p.m. that night, and he asked to speak with Ms. Mitchell.
Roland Adams’ wife, Mary Adams, testified that she heard her husband speaking with his brother, Larry, on the telephone between 8:00 and 9:00 p.m. on the night of the shooting. She said that her husband left their home in their white van to meet his brother, who was having car trouble.
The last witness to testify was Roland Adams. He told the jury that he left his home on the night of the shooting to help his brother, Larry, who was experiencing car trouble. Roland Adams testified that when they were unable to get Larry’s vehicle to run, the brothers drove to Ms. Smith’s home so that Larry could visit his girlfriend, Ms. Mitchell. Roland Adams testified that his brother visited with Ms. Mitchell for a few minutes. Roland Adams also said that he offered to let his brother use the white van so that he, Larry, could pick up his son. Roland Adams testified that when the police stopped the van, his brother was driving him home.
1 sRoland Adams claimed that despite his repeated requests, the police refused to tell him why the van was stopped. Roland Adams further testified that when he was arrested, his cell phone was taken from the cell phone holder on his belt by Officer Julian. Additionally, according to Roland Adams’ testimony, Officers Julian and Bar *12 tholomew searched the van but found no weapons or contraband. After the brothers were transported to police headquarters, their clothes were confiscated.
Roland Adams was on parole at the time of his arrest, and he had been previously convicted for possession of cocaine with the intent to distribute it and for discharging a gun within the city limits. Roland Adams denied knowing Mr. Lampton and denied killing him. He said that the police planted the evidence against him and that he was “framed” in connection with Mr. Lampton’s death.
DISCUSSION
Roland Adams has raised five assignments of error. First, he asserts that that trial court erred in denying his motion to suppress evidence that was seized. Second, he claims that his constitutional right to due process was denied, because he was not identified in a pre-trial identification. Third, he contends that the trial court erred in denying his motion to suppress a statement that he made during the booking process. Fourth, he says that there was insufficient evidence to support the verdict against him. Fifth, he argues that the trial court erred in requiring him to be tried with his brother. Roland Adams also requests that the record be reviewed for errors patent.
ASSIGNMENT OF ERROR I: The trial court erred in denying the motion to suppress and the motion to quash the grand jury indictment. Evidence was seized pursuant to a warrantless search in violation of the Fourth Amendment to the United States Constitution and Article I, Section 5 of the Louisiana | flConstitution of 1974, and the warrant was facially and constitutionally defective pursuant to Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).
Roland Adams advances dual arguments to support his contention that evidence in this case was seized illegally. First, he argues that the trial court erred in denying his motion to suppress the evidence, because the police officers failed to obtain a search warrant to search his white van. Second, he argues that the trial court erred in denying his motion to quash the search warrant that was ultimately obtained, because it was fatally defective as a result of Detective Hamilton’s intentional omission of facts in the application for the search warrant.

Applicable Law

Both the United States and the Louisiana constitutions prohibit unreasonable searches and seizures, and a warrant is normally required for a search to be conducted. U.S. Const, amend. XIV; La. Const, art. I, § 5. In State v. Thompson, 2002-0333 (La.4/9/03), 842 So.2d 330, the Louisiana Supreme Court discussed the subject of warrantless searches and seizures as follows:
It is well settled that a search and seizure conducted without a warrant issued on probable cause is per se unreasonable unless the warrantless seizure and search can be justified by one of the narrowly drawn exceptions to the warrant requirement.
2002-0333, p. 6, 842 So.2d at 335.
An exception to the requirement that a warrant must be obtained before evidence can be seized is the automobile exception. In Pennsylvania v. Labron, 518 U.S. 938, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996), the United States Supreme Court discussed the automobile exception as follows:
Our first cases establishing the automobile exception to the Fourth Amendment’s warrant requirement were based on the automobile’s “ready mobility,” an *13 exigency sufficient to excuse failure to obtain a search warrant once | inprobable cause to conduct the search is clear. More recent cases provide a further justification: the individual’s reduced expectation of privacy in an automobile, owing to its pervasive regulation. If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more.
518 U.S. at 940, 116 S.Ct. at 2487 (citations omitted). See also State v. Edwards, 2000-1246, p. 5 (La.6/1/01), 787 So.2d 981, 986-87, where the Louisiana Supreme Court stated that “[t]he public nature of vehicles and the state regulation and inspection of motor vehicles reduce a motorist’s reasonable expectation of privacy.”
In the Thompson case previously cited, the Louisiana Supreme Court also discussed the automobile exception as follows:
Two requirements must be satisfied before a warrantless seizure of evidence within a movable vehicle can be authorized under this exception: (1) there must be probable cause to believe the vehicle contains contraband or evidence of a crime; and (2) there must be exigent circumstances requiring an immediate warrantless search.
2002-0333, p. 7, 842 So.2d at 336. Quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), the Louisiana Supreme Court stated in the Thompson case that “a fair probability that contraband or evidence of a crime will be found” constitutes probable cause. 2002-0333, p. 8, 842 So.2d at 336. The Supreme Court further stated that probable cause “must be judged by the probabilities and practical considerations of everyday life on which average people, and particularly average police officers, can be expected to act.” Id.
Another exception to the requirement that a warrant must be obtained before evidence can be seized is the plain view exception. In Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), the United States Supreme Court | nstated that “[i]t has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence.” 390 U.S. at 236, 88 S.Ct. at 993.
In Horton v. California, 496 U.S. 128, 136-37, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990), the United State Supreme Court discussed the judicial development of the plain view exception and stated:
It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions that must be satisfied to justify the war-rantless seizure. First, not only must the item be in plain view; its incriminating character must also be “immediately apparent.” ... Second, not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself.
In State v. Jones, 2002-1171, p. 10 (La.App. 4 Cir. 6/26/02), 822 So.2d 205, 211, this Court stated that the Horton case held that evidence found in plain view did not have to be “inadvertently” found to fall within the plain view exception to the warrant requirement.

Claim of Illegal Search without a Warrant

Roland Adams does not assert that the police did not have probable cause to stop the white van in which he was riding. *14 What he does assert, however, is that once the van was stopped and he and his brother were handcuffed, there was no probable cause to justify a search of the van.
In the instant case Officers Julian and Bartholomew heard gunshots while responding to an unrelated matter. They then received a radio dispatch alerting them to a shooting. The officers also received information that a white van had l1gfled the scene of the shooting. As they received this information and were driving in the direction of the crime scene, they saw a white van speeding. Immediately after the officers stopped the van, Mr. Turner, who testified that he witnessed the shooting, drove by in his vehicle, and he confirmed to the 911 dispatcher that police officers had stopped the white van that he had seen leaving the scene of the shooting. Detective Hamilton then notified Officers Julian and Bartholomew that the witness to the shooting had identified the van that they had stopped as being the white van that had fled the crime scene.
At this point the police officers had probable cause to arrest Roland Adams and his brother. Under the automobile exception to the search warrant requirement, the officers were permitted to search the white van. Therefore, the officers did not need a search warrant to conduct a search of the van. The seizure of the gun found in the van would have also been permitted under the plain view exception to the search warrant requirement. After Officer Julian fell and accidentally caused the console in which the gun was placed to shift in such a way that the handle of the gun was in plain view, Officer Julian was legally entitled to seize the gun.
Roland Adams argues that because he and his brother were handcuffed and the police officers had control of the van, the automobile exception to the search warrant requirement was inapplicable. We disagree. The police officers had a compelling, lawful reason for searching the van without a search warrant. They needed to preserve any evidence in this case that might have been located in the van. Therefore, they needed to search for the gun in the van to determine whether they had to widen their search for the gun to areas outside of the van. It was | ^essential that the gun be recovered as evidence if it had been tossed from the vehicle.
Roland Adams argues that State v. Hargiss, 288 So.2d 633 (La.1974), and State v. Massey, 310 So.2d 557 (La.1975), prohibit the type of search that occurred in the instant case. In those cases, the Louisiana Supreme Court found that the exigent circumstances that would permit a warrant-less search under the automobile exception to the search warrant requirement were not present. In the Hargiss case, the automobile was searched after it was driven to the local police station where it was locked and parked. The police had custody of the keys, and the warrantless search was conducted after the owner of the car had been taken to the parish jail and booked. In the Massey case the suspect was arrested inside a co-defendant’s apartment. In connection with the arrest, police officers had seized car keys that were found on a coffee table in the apartment. They then used the keys to search the suspects automobile, which was parked in a lot adjoining the apartment complex where the suspect was arrested. The Supreme Court found that there were no exigent circumstances to justify a warrant-less search of the automobile in the parking lot.
The facts in the instant case are easily distinguishable from those in the Hargiss and Massey cases. Clearly, there were exigent circumstances in the instant case. *15 The van in which Roland Adams and his brother were seen fleeing the crime scene, minutes earlier was stopped and was positively identified by Mr. Turner. The van was speeding, indicating that the circumstances were urgent. The police officers had a right to search the vehicle for the gun that was used in the shooting to determine whether the gun was in the van or whether a more extensive search | uwould have to be conducted. Roland Adams’ assignment of error contending that the search of the automobile was illegal is without merit.

Defective Search Warrant Claim

Roland Adams also argues that the search of the van that occurred after a search warrant was obtained was illegal, because the affidavit on which the application for the warrant was based did not state that the van had been previously searched without a warrant. Roland Adams also claims that the application was defective, because the accompanying affidavit asserts that his brother and he had been positively identified.
In State v. Rey, 351 So.2d 489 (La.1977), the Louisiana Supreme Court adopted the following position regarding search warrants containing inaccuracies:
[W]hen faced with an affidavit containing inaccurate statements the preferred approach is to excise the inaccurate statements and then examine the residue to determine if it supports a finding of probable cause. If, however, the misrepresentations were intentionally made, a different result is required. Because these distorted statements constitute a fraud upon the courts and represent impermissible overreaching by the .government, a warrant based on an affidavit containing intentional misrepresentations must be quashed.
351 So.2d at 492.
Roland Adams argues that the application for a warrant to search the white van after it had been towed to the evidence cage contained two inaccuracies. First, he contends that the- application stated that a known witness had identified the occupants of the white van as the people who were observed shooting the victim. Second, he claims that the application failed to state that a search of the van had been performed at the time of his arrest. Neither of these alleged inaccuracies affects the validity of the search warrant.
hfiMr. Turner’s trial testimony reveals, that he did, in fact, identify the occupants of the van as the persons involved in the shooting on Deslonde Street. When he saw that police officers had stopped the white van that he had been following in an attempt to obtain its license number, Mr. Turner told the 911 dispatcher that “that’s the guys right there.” Clearly, Mr. Turner did identify Roland Adams and his brother as the persons who fled the crime scene. Additionally, the failure to include in the search warrant application a statement that a search had been conducted incident to the arrest of the Adams brothers, while important, is not critical to the validity of the search warrant when considering the totality of the circumstances presented in this case. There is no evidence that the omission of any reference to the prior search was intended in any way to mislead or deceive anyone. The police officers who searched the van incident to the Adams brothers’ arrests had the right to seize the gun at the time of that search but chose no the do so.
Roland Adams relies on Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to support his argument that the search warrant obtained in this case should have been quashed. In the Franks case, the United States Supreme Court said that “allegations of deliberate falsehood or of reckless disregard *16 for the truth ... must be accompanied by an offer of proof’ to successfully attack an affidavit used to support a search warrant. 438 U.S. at 171, 98 S.Ct. at 2684. Additionally, “[allegations of negligence or innocent mistake are insufficient.” Id. Finally, “when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause,” there is no need for an evidentiary hearing |1fito determine whether the warrant violates a defendant’s constitutional rights. 438 U.S. at 171-72, 98 S.Ct. at 2684.
In the instant case a statement that the van had previously been searched incident to the arrest of Roland Adams and his brother was certainly important information that could have been utilized by the magistrate when considering the application for a search warrant. The prior search was lawful, however, so any reference to it in the affidavit would have simply supported a finding of probable cause. Therefore, without the statement, there was clearly sufficient information in the affidavit to support a finding of probable cause to search the van. Roland Adams’ assignment of error regarding alleged defects in the affidavit is without merit.
ASSIGNMENT OF ERROR II: The appellant was denied his right to due process of law guaranteed under Article I, Section 2 of the Louisiana Constitution of 1974 and the Fifth and Fourteenth Amendments to the United States Constitution as there was no pretrial identification of the appellant.
Roland Adams asserts that his federal and state constitutional rights were violated, because there was no pretrial identification of him as the person who shot Mr. Lampton. He contends that he was arrested only because his vehicle was similar to the vehicle in which the real perpetrators fled the scene of the crime.
In State v. Brooks, 294 So.2d 503, 504 (La.1974), the Louisiana Supreme Court stated that “[w]e know of no law nor do appellants cite any jurisprudence granting them the right to a lineup prior to an in-court identification.” Again in State v. Wright, 316 So.2d 380, 382 (La.1975), the Supreme Court stated that the “[djefen-dant has no right to a pretrial line-up.”
117Thus, Roland Adams has neither a constitutional nor a statutory right to have a pretrial identification procedure conducted. His assignment of error is without merit.
ASSIGNMENT OF ERROR III: The trial court erred in denying the appellant’s pretrial motion to suppress statement, thereby committing a violation of the appellant’s Fifth Amendment right against self-incrimination and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
Roland Adams contends that the trial court’s denial of a motion to suppress statement violated his constitutional right not to incriminate himself. A pretrial motion for disclosure of any statements made by Roland Adams was filed, but the State failed to disclose any statements that were made. Roland Adams specifically complains about the following testimony that was elicited from Officer Julian on cross-examination at a hearing on a pretrial motion:
A. He [Roland Adams] was talking about his tennis shoes.
Q. Okay.
A. That he wanted to keep them to play basketball.
Q. Okay
A. I told him you can’t keep them.
Q. All right.
*17 A. And he talking about he don’t want to catch me wearing them.
Q. Okay.
A. And I said, “And if you do?” He said, “You see my work,” or “you saw my work,” or something like that.
Roland Adams contends that the statement he allegedly made to Officer Julian “clearly amounts to a threat and is further a confession” and that the State, therefore, violated his constitutional right not to incriminate himself by asking an informal question (“And if you do?”) that was designed to lead him to make incriminating statements. The State contends, however, that the statement regarding the tennis shoes was not introduced to convict Roland Adams and that, |isinstead, the statement was simply a response to a question raised by the defense on cross-examination.
Although Roland Adams does not refer in his brief to the testimony that was given at the trial regarding his tennis shoes, we note that on direct examination at the trial, Officer Julian testified regarding the comments Roland Adams had made to him. The following exchange occurred at the trial:
Q. Were those the white tennis shoes?
A. The white tennis shoes. He was asking me to let him keep them so he could play basketball. I told him, “You can’t keep them, Bra. You got to give them up.” So he was telling me, “I don’t want to catch you wearing my brand new tennis shoes,” or something like that. So he gave them up, though. He gave them up. And as me and him were walking out he kept saying that he didn’t want to catch me with the tennis shoes on. And he told me something as far as, “You see my work?”
We do not find that the conversation was inculpatory, and it clearly did not rise to the level of a confession. -Nothing in the statements made by Roland Adams suggested that he admitted the crime committed on Deslonde Street. The oral exchange between Roland Adams and Officer Julian was nothing more than idle conversation or banter that occurred during the booking process.
Even if Roland Adams’ statements were improperly admitted into evidence at the trial, any error that occurred was harmless error. In Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), the United States Supreme Court discussed the standard to be used to determine whether an error in a criminal case is harmless. The Supreme Court stated that “[t]he inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.” 508 U.S. at 279, 113 S.Ct. at 2081 (emphasis in original). In the instant case, the evidence presented at the trial overwhelmingly supported the guilty verdict rendered by the jury. The jury’s verdict was supported by the following: (1) the testimony of the eyewitness to the crime was uncontradicted except by Roland Adams, who testified that he was “framed;” (2) Roland Adams’ cell phone was recovered at the crime scene; (3) a gun was seized from Roland Adams’ van; and (4) a ballistics expert confirmed that bullets recovered from the victim’s body were fired from that gun. The verdict reached by the jury was certainly not attributable to the statements that Roland Adams made about his tennis shoes while he was being booked. Clearly, if it were error at all to admit testimony about the conversation concerning Roland Adams’ tennis shoes, it was harmless error.
*18 Because we find that, at best, the testimony regarding Roland Adams’ statements to Officer Julian was in no way inculpatory and that, at worst, it was harmless error, Roland Adams’ assignment of error is without merit. Therefore, it is unnecessary for us to reach the issue Roland Adams has raised regarding his rights under the Miranda case. We do note, however, that Roland Adams had been advised of his Miranda rights at the time of his arrest. Therefore, he spoke at his own peril to Officer Julian, who, in fact, was not questioning Roland Adams about the crime with which he was being charged. Officer Julian was simply asking Roland Adams for his tennis shoes. The threat Roland Adams made was in no way a response to any interrogation about the shooting.
ASSIGNMENT OF ERROR IV: The appellant was denied his right to due process of law under the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Louisiana Constitution as there was insufficient evidence to support the verdict.
| apRoIand Adams argues that the evidence in this ease was insufficient to support his conviction of second degree murder. He claims that the State failed to establish the chain of custody for key items of evidence, that the police officers failed to preserve the crime scene, that certain forensic testing was not performed, and that Mr. Turner’s eyewitness testimony was unreliable.

Applicable Law

In Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, § 1, created the following standard of review for federal courts to use in determining whether the evidence in a state criminal case was sufficient to support a conviction:
[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be ... whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.... [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
443 U.S. at 318-19, 99 S.Ct. at 2788-89 (footnote omitted) (citation omitted).
In State v. Mussall, 523 So.2d 1305 (La.1988), the Louisiana Supreme Court stated that “this court ... recognized that ... the Jackson holding also applies to state direct review of criminal convictions.... ” Id. at 1309. The Supreme Court in Mussall also recognized that the Louisiana Constitution has a due process clause “virtually identical to its Fourteenth Amendment model. La. Const. Art. I, § 2.” Id.
|g1In Mussall, the Supreme Court stated that a review of the record in a criminal case does not require the reviewing court to determine whether the reviewing court believes the evidence at the trial established guilt beyond a reasonable doubt. Instead, the Supreme Court discussed the proper focus for the reviewing court:
[A] reviewing court must consider the record through the eyes of a hypothetical rational trier of fact who interprets all of the evidence as favorably to the prosecution as any rational fact finder can.... [T]he inquiry requires the reviewing court to ask whether such a hypothetical rational trier of fact interpreting all of the evidence in this manner could have *19 found the essential elements of the crime beyond a reasonable doubt.
523 So.2d at 1309-10 (footnotes omitted). See also State v. Tate, 2001-1658, p. 4 (La.5/20/03), 851 So.2d 921, 928, cert. denied stib nom., Tate v. Louisiana, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004).

Chain of Custody

Roland Adams contends that the chain of custody for the cell phone that Detective Hamilton testified was found at the crime scene was never established. In fact, Roland Adams testified that Detective Hamilton obtained the cell phone by removing it from the cell phone holder that Roland Adams was wearing when the phone was seized at the time of his arrest.
In State v. Godeaux, 378 So.2d 941 (La.1979), the Louisiana Supreme Court discussed the effect that the chain of custody of physical evidence introduced at a criminal trial has on the sufficiency of that evidence. The Supreme Court stated:
To admit demonstrative evidence at trial, the law requires that the object be identified. The identification can be visual, that is, by testimony at the trial that the object exhibited is related to the case. It can also be [^identified by chain of custody, that is, by establishing the custody of the object from the time it was seized to the time it was offered into evidence. A continuous chain of custody is not essential to enable the state to introduce physical evidence as long as the evidence as a whole establishes that it is more probable than not that the object introduced was the same as the object originally seized by the officer.
Id. at 944 (citations omitted). See also State v. Davis, 411 So.2d 434, 438 (La.1982).
In State v. Richardson, 96-2598 (La.App. 4 Cir. 12/17/97), 703 So.2d 1371, this Court considered the sufficiency of evidence in a situation where the chain of custody has not been demonstrated. This Court stated:
As a foundation for admitting demonstrative evidence, it must be established that the object sought to be introduced is more probably than not connected with the case. A lack of positive identification of demonstrative evidence or its chain of custody goes to the weight of the evidence, not to its admissibility, and the connection of that evidence to the case is a factual matter to be determined by the trier of fact.
96-2598, p. 4, 703 So.2d at 1373 (citations omitted).
In the instant case Detective Hamilton testified that he found the cell phone at the crime scene and that it remained in his custody until it was taken to the central evidence room at police headquarters several weeks after Mr. Lampton was shot. Because the phone was not placed with the other evidence in this case until several weeks after the phone was seized, Roland Adams contends that a proper chain of custody for the phone was not established.
We note, however, that under the jurisprudence discussed above, whether there was a proper chain of custody was a question of fact to be decided by the jury. In this case the jury was presented with conflicting testimony regarding where Roland Adams’ cell phone was seized. Roland Adams testified that the cell | ssphone was taken from him at the time of his arrest, and Detective Hamilton testified that the cell phone was found at the crime scene. There was no dispute, however, that the cell phone, in fact, belonged to Roland Adams. Clearly, there was a reasonable basis to conclude that the State proved that the cell phone introduced into evi *20 dence at Roland Adams’ trial was more probably than not connected with the case. Roland Adams’ assignment of error regarding the issue of the chain of custody of the cell phone is without merit.

Failure to Preserve the Scene

Roland Adams argues that both the scene of the crime and the scene of his arrest were compromised. He contends that the way in which the gun was seized from the white van demonstrated that the police officers tampered with that evidence. Additionally, he contends that the police officers tampered with the evidence at the crime scene by returning to the victim’s mother her cell phone, which was found in the car where her son was killed. Finally, Roland Adams claims that unspent AK-47 ammunition that was found in a driveway near the scene of the shooting was not sufficiently investigated.
There was no evidence that the crime scene or the scene of Roland Adams’ arrest was compromised. There was undisputed testimony at the trial that the entire block in which the shooting occurred was secured and that only police and medical personnel had access to the crime scene. The officers at the scene maintained a log that tracked the identity and arrival time of the emergency medical service and the crime scene investigators.
Roland Adams’ claim that returning Ms. Lampton’s cell phone to her tainted the crime scene is unfounded. He argues that had the phone not been returned to its owner, the phone’s contact list could have been examined, but he fails to ^explain how any exculpatory evidence was lost, particularly in light of the fact that Roland Adams testified that he did not know the victim.
Roland Adams further contends that the police compromised the crime scene by failing to test unspent AK-47 ammunition retrieved from a driveway on Deslonde Street several days after the shooting. He does not, however, explain how testing the ammunition would have had any bearing on the instant case when the autopsy of the victim conclusively showed that the murder weapon was a nine-millimeter semi-automatic weapon.
Finally, Roland Adams claims that the scene of his arrest was compromised by the handling of the gun found in his white van. He does not, however, explain how the scene was compromised.
Roland Adams has failed to show that either the crime scene or the scene of his arrest was compromised. His assignment of error is without merit.

Failure to Perform Forensic Testing

Roland Adams argues that if he had fired the murder weapon, there would have been forensic evidence, such as blood and gunpowder residue, on his clothing and on his hands that would have linked him to the crime. By failing to perform forensic tests that would have shown that there was no blood or gunpowder on him or his clothing, Roland Adams contends that the State deprived him of exculpatory evidence.
There was no visible blood on Roland Adams’ clothing, however, and the testimony at the trial established that the State does not have the equipment needed to test for gunpowder residue and does not routinely arrange for such testing by a forensic laboratory. Additionally, Dr. McGarry, the forensic pathologist who testified at the trial, stated that testing for gunpowder residue is not infallible. The 1 gstest results may be negative for gunpowder residue when, in fact, a person has fired a gun. Roland Adams’ assignment of error regarding the lack of forensic testing is without merit.

*21
Unreliable Eyewitness

Roland Adams argues that the testimony of the eyewitness to the shootings, Mr. Turner, was not reliable, because Mr. Turner failed to mention to the police two unique characteristics of Roland Adams’ van, namely, the tinted windows and the large blue graphics on the van. Further, Roland Adams claims that Mr. Turner had suffered from a severe head injury while he was working as a longshoreman and that any memory impairment he might have as a result of the injury was not sufficiently explored at the trial. Finally, Roland Adams asserts that the package that Mr. Turner said was taken from the victim’s vehicle was never located, thus indicating that Mr. Turner’s testimony regarding the package was unreliable.
We find that Roland Adams’ assignment of error regarding the eyewitness’ testimony is without merit. Mr. Turner testified that he had a severe head injury but that his memory was not impaired. The jury was able to observe Mr. Turner’s demean- or to determine whether he was in any way impaired. Clearly, based on the verdict, the jury did not find that Mr. Turner’s testimony was unreliable.
ASSIGNMENT OF ERROR V: The trial court erred in denying the defense motion to sever in violation of the appellant’s due process right to present a defense under the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 5 of the Louisiana Constitution of 1974.
Roland Adams argues that because his brother, Larry, intended to raise a defense of lack of specific intent to kill, his brother’s defense would be antagonist to his defense, which would be based on an alibi. After Roland Adams learned of his brother’s proposed defense, Roland Adams filed a motion to sever his trialj^from that of his brother. Roland Adams claimed in his motion to sever that his brother planned to present a defense that would require him to defend not only against the State’s case with an alibi defense but also against his brother’s position, which would effectively admit that the brothers were at the crime scene. The trial court denied the motion, and Roland Adams is now claiming that the trial court committed legal error that denied him of his constitutional right to due process. According to Roland Adams’ argument, he was denied the right to cross-examine his brother because of his brother’s right not to testify at the trial.
La.C.Cr.P. art. 704 provides:
Jointly indicted defendants shall be tried jointly unless:
(1) The state elects to try them separately; or
(2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.
In State v. Bradford, 367 So.2d 745 (La.1978), the Louisiana Supreme Court discussed the right of a criminal defendant to have his trial severed from that of a code-fendant The Supreme Court stated:
A mere allegation by a defendant that he will attempt to cast blame on his codefendant does not suffice. The judge must be satisfied by convincing evidence that justice requires a severance. And the granting or refusal of the severance is committed to the sound discretion of the trial judge which will not be overturned, except upon a showing by defendant that actual prejudice resulted from the denial.
367 So.2d at 747. See also State v. Williams, 418 So.2d 562, 564 (La.1982), where the Supreme Court stated that a motion for a severance of offenses “is *22 _[¿íaddressed to the sound discretion of the trial court and the court’s ruling should not be disturbed on appeal absent a showing of an abuse of discretion.”
In State v. Washington, 386 So.2d 1368 (La.1980), the Supreme Court again discussed the severability of offenses. The Supreme Court stated:
[T]he trial court must weigh the possibility of prejudice versus the important considerations of judicial economy and administration. In determining whether prejudice may result from the joinder, the court should consider ... whether the defendant could be confounded in presenting his various defenses....
Id. at 1371.
In the instant case although Roland Adams contends that his brother’s defense was antagonistic to his, the record does not reflect this. Larry Adams’ counsel did ask several of the State’s witnesses whether their testimony indicated that Larry Adams had specific intent to kill Mr. Lampton, but their negative responses in no way implicated Roland Adams in Mr. Lampton’s death. Further Larry Adams did not testify at the trial, and his counsel did not argue that Roland Adams committed any crime. There was no evidence whatsoever that Larry Adams’ defense prejudiced Roland Adams.
Based on the applicable jurisprudence, because their was no showing that Roland Adams was prejudiced in any way by the trial court’s denial of his motion to sever, we cannot disturb the trial court’s denial of the motion. This assignment of error has no merit.
ASSIGNMENT OF ERROR VI: The appellant respectfully requests review of the entire record for errors patent pursuant to Article 920(2) of the Louisiana Code of Criminal Procedure.
Roland Adams has requested a review of the record to determine whether there are any errors patent. La.C.Cr.P. art. 920 provides:
| {>sThe following matters and no others shall be considered on appeal:
(1) An error designated in the assignment of errors; and
(2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence.
We note that Roland Adams has asserted that the trial court failed to inform him of his rights regarding post-conviction relief. La.C.Cr.P. art. 930.8(C) provides that “[a]t the time of sentencing, the trial court shall inform the defendant of the prescriptive period for post-conviction relief either verbally or in writing.” We agree that there is nothing in the record to indicate that the trial court gave Roland Adams this information. Therefore, he is hereby notified in writing that pursuant to La. C.Cr.P. art. 930.8(A), “[n]o application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of the conviction and sentence has become final pursuant to La.C.Cr.P. arts. 914 or 922,” unless the specific exceptions included in La. C.Cr.P. art. 930.8(A)(1), (2), or (4) are applicable.
We have also reviewed the record in this case for evidence of other errors patent. We find none.
CONCLUSION
Roland Adams’ conviction and sentence are hereby affirmed. A copy of this opinion, which sets forth the information required to be given to him pursuant to La.C.Cr.P. art. 930.8(C), shall be mailed to him by this Court.
*23 CONVICTION AND SENTENCE AFFIRMED.
LOVE, J., concurs in part and dissents in part, with reasons.
TOBIAS, J., concurs in part and dissents in part.

. La. R.S. 14:30.1(A)(1) defines second degree murder as "the killing of a human being: ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm.”

. La. R.S. 14:30.1(B) provides that "[w]hoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.”

. We note that there was no appellate oral argument on behalf of Roland Adams. In cases such as this where a person has received a life sentence and there are a number of complex assignments of error, it is very helpful to this Court to have the benefit of oral argument by both the State and the defense. While the failure of Roland Adams' counsel to present oral argument on his behalf does not constitute ineffective assistance of counsel in this case, there might be situations where the failure to present oral argument on behalf of a client could constitute ineffective assistance of counsel.