ROSEMARY LEDET, Judge.
| jThis application for supervisory writ is before this court on remand from the Louisiana Supreme Court. The sole issue presented by this writ is whether the district court correctly denied the defendant’s motion to suppress evidence seized without a warrant from the vehicle in which he was riding as a front seat passenger.

STATEMENT OF THE CASE

On August 23, 2012, the State of Louisiana charged the defendant, Otis Lockett, with one count of being a convicted felon in possession of a firearm, a violation of La. R.S. 14:95.1. At his arraignment, Otis Lockett pled not guilty to the charge. On October 11, 2012, the district court heard and denied Otis Lockett’s motion to suppress the evidence and found probable cause to substantiate the charges. From that ruling, Otis Lockett filed a writ application with this court. This court denied Otis Lockett’s writ, noting that “[i]n the event the Relator ultimately is convicted, he has an adequate remedy on appeal.” State v. Lockett, 12-1561 (La.App. 4 Cir. 1/2/13) (unpub.). The Louisiana Supreme Court granted Otis |2Lockett’s writ application and remanded to this court for “briefing, argument and opinion.” State v. Lockett, 13-0170 (La.4/1/13), 110 So.3d 133, 134 (mem.). On remand, we entertained oral and written argument from both sides. For the reasons that follow, we find no error in the district court’s denial of the motion to suppress and deny Otis Lock-ett’s writ.

STATEMENT OF THE FACTS

The testimony of Sergeant Daniel Anderson, a sixteen-year veteran of the New Orleans Police Department (“NOPD”) and the sole witness at the motion to suppress hearing, established the following facts. At about 10:30 p.m. on June 27, 2012, Sergeant Anderson was sitting alone in his patrol car in the parking lot of the Ideal Food Store, which is near the intersection of Canal and Galvez Streets. While sitting at that location, he noticed “a Pontiac traveling in the far left lane [of Canal Street] rolling at a very, very slow pace, with vehicles that were actually coming up on the bumper and going around the vehicle.” He also noticed that there were two occupants in the Pontiac — a driver and a front seat passenger — and that the Pontiac had a cracked windshield. Sergeant Anderson pulled behind the Pontiac and ran its license plate. He learned that it belonged to Frederick Lockett, who was identified as the driver of the vehicle and as the passenger’s (Otis Lockett’s) nephew.
Based on the traffic infractions, Sergeant Anderson decided to stop the Pontiac and activated his lights and siren.[1] The driver of the Pontiac pulled over |sfrom the left lane to the right lane of Canal Street as if he was preparing to stop, but failed to come to an immediate stop. At that point, Sergeant Anderson directed his exterior spotlight on the Pontiac, which illuminated the entire interior of the vehicle. He observed that the passenger — Otis Lockett— was making “quite a bit of furtive move *889 ments.” He defined “furtive movements” to mean “actions that are uncommon actions that normal people would not initiate, especially during a traffic stop.” He described the passenger’s furtive movements as turning to the left and reaching to the backseat. On cross-examination, Sergeant Anderson explained:
A. The fact that he [Otis Lockett] turned to the left and reached to the backseat, to me that sends out signals. I am not sure if there are other occupants, people or what.
I have come up on cars and there are four occupants in there when I thought there was two.
I was unable to determine exactly what was going on there, and it did set off alarms.
To me that was very suspicious and unordinary activity, especially during a traffic stop.
# ⅝ ⅜ ⅜ ⅝ ⅜
Q. It sounds like what you saw was a passenger turn to the left and reach towards the back.
Is that fair?
A. I couldn’t see the reach.
It was what it appeared to be.
I wasn’t in the vehicle.
I was travelling behind.
I can only account for what I actually observed.
|4If it looked like he was reaching, did I see his hand reach back there, no I did not.
Q. Okay.
So you just saw the turn of the body?
A. The turning and the movement toward.
If I was in a vehicle and I was reaching to the back, that’s exactly what I would have done.
Q. Okay.
A. Even in my report, I notated that it appeared that he was reaching back there.
Q. Right.
And, so, other than the turning of the body and appearance like the passenger was reaching to the back, did you see any other movements that you would have characterized as furtive?
A. No.
Sergeant Anderson’s testimony was that he did not actually see Otis Lockett reach into the back seat, but Otis Lockett’s movements that he did see were consistent •with that action.
Sergeant Anderson further testified that the passenger’s furtive movements “heightened his alertness.” Given the passenger’s furtive movements coupled with the fact he was outnumbered (he was on patrol alone; the vehicle had two occupants), Sergeant Anderson contacted the dispatcher and requested backup assistance.
Once the Pontiac came to a complete stop, Sergeant Anderson, utilizing his public address system, ordered the driver to exit the vehicle. As the driver exited the vehicle, Sergeant Anderson told him to leave his driver’s door open for the | sofficer’s safety. The driver complied. As he approached the driver, Sergeant Anderson shined his flashlight into the vehicle and observed that the passenger was looking straight down and “doing something with his phone” — either talking or playing a game on it. While he was conversing with the driver right outside the driver’s door and waiting for his backup, Sergeant Anderson testified that he “kept and maintained a constant visual on [the passenger, Otis Lockett].” He stated that his suspicions were raised because the passenger “was moving around a little bit” in his seat and “was just continuously on his *890 telephone” as if the officer was invisible. He noted in his report that Otis Lockett appeared nervous. Sergeant Anderson described Otis Lockett as wearing a long-sleeve hoodie with the hood up and long jeans, which he found odd considering it was during “the hot months in New Orleans.”
When the backup officers arrived, Sergeant Anderson directed the driver to the back of the vehicle. While one of the backup officers maintained contact with the driver, Sergeant Anderson and the other backup officer approached the passenger door and asked Otis Lockett to step out of the vehicle. Otis Lockett complied. The officers then directed Otis Lockett to the rear of the vehicle. With both the driver and passenger at the rear of the vehicle, Sergeant Anderson approached the passenger side of the vehicle and surveyed the inside of the vehicle. Explaining his actions, Sergeant Anderson testified:
I then went over to the passenger side of the vehicle and surveyed the inside. I was curious about the suspicious activity. Why he [Otis Lockett] was making the abrupt movements during a traffic stop.
| fAt that point, there was a small square plastic flexible lunch pail. It was closed, but it was unzipped. But, it wasn’t directly on the zip. And, I looked in and I seen silver and from experience dong proactive work for sixteen years, I knew it was a gun.
So at that point I looked, and I see a forty-five caliber weapon.
On cross-examination, Sergeant Anderson explained that he looked into the vehicle in the direct area where he had “observed the furtive movements, and that’s when the lunch box caught [his] ... eye.” He further explained that it was a four-door vehicle, that he opened the rear passenger door, and that the closed, but unzipped lunch box was sitting there “in the middle portion of the back seat, but slightly closer to the passenger side.” He still further explained that when he put his flash light on it he could see “something silver” that he determined to be a chrome colored weapon in the lunch box. Although there was food inside the lunch box, the gun was lying on top of the food. The gun was under the lid, but it was still visible as he looked into the vehicle. Sergeant Anderson lifted the lid to the lunch box, confirmed it was a handgun, and then exited the vehicle.
Sergeant Anderson walked to the back of the vehicle and asked both Frederick and Otis Lockett if there were any weapons or drugs in the vehicle. Both of them adamantly denied any knowledge of contraband in the vehicle. Sergeant Anderson then returned to the vehicle, retrieved the gun, and presented it to Frederick and Otis Lockett. Sergeant Anderson also advised them of their Miranda rights.
Frederick Lockett acted with disbelief when Sergeant Anderson showed him the gun. He acknowledged that the lunch box was his and stated that he brings his 17lunch in it to work every day; however, he denied knowing anything about the gun. Frederick Lockett stated that he had just picked up Otis Lockett on Washington Avenue. Frederick Lockett further stated that Otis Lockett made a movement. He stated that he did not know what Otis Lockett was doing, but he said he had watched him make a movement back. At the end of the investigation, Frederick Lockett gave a voluntary written statement as to what he had seen, which read: “I picked him up [Otis Lockett] and I did not observe any weapon on his person. When we were pulled over, I did see him *891 reaching toward the back. I don’t know what or if he was reaching for.”
Otis Lockett identified Frederick Lock-ett as his nephew and confirmed that Frederick Lockett had just picked him up on Washington Avenue. Otis Lockett stated that he did not know why his nephew was driving so slowly. Otis Lockett denied knowing anything about the gun. Indeed, he told the officers that he was on parole for another five months (which proved to be correct) and that he therefore would not have a gun. Although Otis Lockett initially gave the officers a false first name and date of birth, he eventually provided his correct information. When the officers ran his real name, they discovered that Otis Lockett had several felony convictions. Frederick Lockett had none.
Sergeant Anderson testified that he ticketed Frederick Lockett for impeding the flow of traffic, for having a cracked windshield, and possibly for having an expired brake tag. After Mirandizing and interviewing both Frederick and Otis Lockett, Sergeant Anderson determined that Otis Lockett had placed the gun into | sthe lunch box. He thus arrested Otis Lockett for being a felon in possession of a firearm. The search incident to Otis Lockett’s arrest produced a pair of rubber gloves and a knit hat. Sergeant Anderson explained that he did not request that the gun be examined for fingerprints because it was determined that the surface of the gun was not suitable for processing prints.
The State introduced Frederick Lock-ett’s statement and certified documents of Otis Lockett’s prior armed robbery conviction.
DISCUSSION
Appellate courts review a district court’s factual findings under a deferential standard; whereas, legal findings are subject to a de novo standard of review. State v. Hunt, 09-1589, p. 6 (La.12/1/09), 25 So.3d 746, 751 (citing State v. Hampton, 98-0331, p. 18 (La.4/23/99), 750 So.2d 867, 884). As noted by the Louisiana Supreme Court in State v. Thompson, 11-0915, pp. 13-14 (La.5/8/12), 93 So.3d 553, 563:
The analysis may be further broken down into the component parts of the trial court decision. ‘When a trial court makes findings of fact based on the weight of the testimony and the credibility of the witnesses, a reviewing court owes those findings great deference, and may not overturn those findings unless there is no evidence to support those findings.” Wells, 2008-2262, p. 4; 45 So.3d at 580; State v. Hunt, 2009-1589, p. 6 (La.12/1/09); 25 So.3d 746, 751. Legal findings or conclusions of the trial court are reviewed de novo. Id.; State ex rel. Thibodeaux v. State, 2001-2510, p. 1 (La.3/8/02); 811 So.2d 875.
Moreover, a trial court’s decision relative to the suppression of evidence is afforded great weight and will not be set aside unless there is an abuse of that discretion. State v. Wells, 08-2262, p. 5 (La.7/6/10), 45 So.3d 577, 581.
l9Both the federal and state constitutions protect a person’s reasonable expectation of privacy even when an occupant of a vehicle. Both the federal and state constitutions prohibit unreasonable searches and seizures; a warrantless search and seizure is presumed to be unreasonable. State v. Bridges, 11-1666, p. 5 (La.App. 4 Cir. 11/28/12), 104 So.3d 657, 661-62 (citing State v. Thucos, 390 So.2d 1281, 1286 (La.1980)). The State has the burden of proving that any evidence seized without a warrant was lawfully seized. La.C.Cr.P. art. 703 D; see Wells, supra. In order to justify a warrantless search, the State must show that the search falls within one of the narrowly drawn exceptions to the warrant requirement. See *892 State v. Barrett, 408 So.2d 903, 904 (La.1981).
In moving to suppress the evidence, Otis Lockett challenges neither the initial stop of the vehicle nor the officer’s command to exit the vehicle.[2] Rather, he challenges the legality of Sergeant Anderson’s warrantless entry into the vehicle and his seizure of the weapon found in the lunch box. He contends that none of the exceptions to the warrant requirement applies here. More precisely, he identifies four potential exceptions — the automobile exception, the plain view exception, the search incident to arrest, and the protective Terry sweep exception — and contends that none of these exceptions applies here. The State counters that the officer had the right to conduct a protective Terry sweep of the area in which he observed Otis Lockett reach during the traffic stop. Stated otherwise, the State’s position is that |10the protective Terry sweep exception applies here. In ordered to decide the issue presented, we review the four exceptions cited by Otis Lockett.
Under the automobile exception, if Sergeant Anderson had probable cause to believe that the vehicle contained contraband when he opened the vehicle door, a warrantless search of the vehicle would have been justified. State v. Anderson, 06-1031, p. 5 (La.App. 4 Cir. 1/17/07), 949 So.2d 544, 547-48; see also Maryland v. Dyson, 527 U.S. 465, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999); State v. Adams, 04-2177 (La.App. 4 Cir. 6/29/05), 909 So.2d 5.[3] As Otis Lockett correctly contends, such was not the case here.
The plain view exception requires that an officer have a prior justification for being in an area where he observes an object that is “immediately apparent” to him without close inspection as contraband. State v. Jones, 02-1171 (La.App. 4 Cir. 6/26/02), 822 So.2d 205; see also State v. Smith, 96-2161 (La.App. 4 Cir. 6/3/98), 715 So.2d 547. When Sergeant Anderson opened the rear door to the vehicle and shined his light inside, he saw part of a gun lying inside a lunch box.[4] As the State points out, “[w]hen the sergeant opened the *893 rear door of the vehicle to look into the backseat, he observed the firearm in plain view.” Nonetheless, as lnOtis Lockett contends, this exception alone did not justify the search because Sergeant Anderson had to open the vehicle door to view the lunch box. Thus, the crucial element in deciding whether the plain view exception applies is whether Sergeant Anderson had a prior justification for opening the door and looking inside the vehicle. (As discussed below, because we conclude that the protective Terry sweep exception applies here, Sergeant Anderson had a prior justification.)
The search incident to an arrest exception does not apply here because neither the driver nor the passenger (Otis Lock-ett) was under arrest when Sergeant Anderson opened the vehicle door.
The protective Terry sweep exception is based on the Supreme Court’s holding in Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), that:
“[ Once a valid Terry stop of the vehicle occurs] the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on “specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant” the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.”
Long, 463 U.S. at 1049-50, 103 S.Ct. at 3481 (quoting Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)). Under the protective Terry sweep exception, an officer may search the vehicle if the officer reasonably believes that a prior occupant of the vehicle is dangerous and possibly may gain access to weapons. As Justice Sealia noted in his concurrence in Arizona v. Gant, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), “[i]n the no-arrest case, the possibility of access to weapons in the vehicle |12always exists, since the driver or passenger will be allowed to return to the vehicle when the interrogation is completed.” Gant, 556 U.S. at 352, 129 S.Ct. at 1724 (Scalia, J., concurring).[5]
The Louisiana Legislature has codified the requirements for a Terry search in La.C.Cr.P. art. 215.1, which provides:
When a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably suspects that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon. If the law enforcement officer reasonably suspects the person possesses a dangerous weapon, he may search the person.
The jurisprudence has held that the reasonableness of a Terry search is governed by an objective standard. State v. Dumas, 00-0862, pp. 2-3 (La.5/4/01), 786 So.2d 80, 81-82. This objective standard “requires only that an officer establish a ‘substantial possibility’ of danger existed, not that it was more probable than not that the detained individual was armed and dangerous.” State v. Mulder, 11-0424, p. 8 (La.App. 4 Cir. 10/19/11), 76 So.3d 1241, 1247 (citing State v. Hunter, 375 So.2d 99, 102 (La.1979)).
The jurisprudence has recognized that if an officer has at least a reasonable suspi *894 cion to stop a vehicle and an occupant of the vehicle makes furtive movements during the stop, as if attempting to conceal an object, the officer has the right to conduct a limited protective sweep of the vehicle. See Long, supra; Bridges, supra; State v. Dillon, 98-0861 (La.App. 4 Cir. 6/24/98), 719 So.2d 1064; State v. Davis, 612 So.2d 256 (La.App. 4th Cir.1992); State v. Williams, 489 So.2d 286 (La.App. 4th Cir.1986); State v. Archie, 477 So.2d 864 (La.App. 4th Cir.1985); State v. Carver, 531 So.2d 551 (La.App. 5th Cir.1988). Summarizing the jurisprudence, this court in Bridges, supra, stated:
Ms. Bridges does not contest the reasonableness of the initial stop and detention. The question presented here is whether Officer Aubert was justified in searching under the passenger seat. In State v. Davis, 612 So.2d 256, 258 (La.App. 4 Cir.1992), the defendant was speeding, and as the police officers pulled next to him to wave him over to stop, they saw the defendant reach down and place something under the seat. The officers stopped the car, ordered the defendant out of the car, and searched under the seat, finding contraband. Id. Prior to reaching its decision in Davis, the Fourth Circuit reviewed State v. Archie, 477 So.2d 864, 865-866 (La.App. 4 Cir.1985), in which this Court ruled that an exaggerated motion as if to place something under the seat could easily lead a reasonably prudent man to believe that his safety or the safety of others was in danger and justified the search. Id. at 259. Based upon this Court’s holding in Archie, the Davis Court found that the police were justified in looking under the seat after the driver and passenger exited and thus upheld the search and seizure of the contraband. Id.
In the present case, Officer Aubert testified that after pulling the vehicle over, he observed Ms. Bridges motion as if she were putting something under the seat. Thus, like the police officers in Archie, 477 So.2d at 866, and Davis, 612 So.2d at 259, Officer Aubert and his partner could reasonably believe that Ms. Bridges was trying to hide or retrieve something, possibly a weapon. Accordingly, Officer Aubert was justified in ordering the occupants out of the car and searching under the passenger seat.
Bridges, 11-1666 at pp. 6-7, 104 So.3d at 661-62.
Otis Lockett argues that this line of jurisprudence, summarized in Bridges, supra, is factually distinguishable in that in those cases “the officers testified to more particularized factors than in this case, and in most [those cases] the officers also articulated a safety concern as the basis for the search.” He contends that in this case Sergeant Anderson never articulated any fear for his safety or a belief that weapons were present. Moreover, he contends that any such representation would 114not have been credible. He emphasizes that Sergeant Anderson testified only that Otis Lockett rotated in his car seat and appeared unusually occupied with his cell phone, neither of which provide justification for a Terry stop. We find this argument unpersuasive.
Contrary to Otis Lockett’s contention, Sergeant Anderson articulated that he had safety concerns before he opened the vehicle door and conducted the search. He testified that the passenger’s furtive movements coupled with the driver’s delay in stopping “heightened his alertness” and prompted him to call for backup assistance. While waiting for backup to arrive, which took only a few moments, he instructed the driver to exit the vehicle and to leave the driver’s door open for the officer’s safety. Although he allowed the *895 passenger to remain in the vehicle until backup arrived, he maintained a constant lookout of the passenger’s actions during this period. Thus, Sergeant Anderson’s actions and testimony indicate that his limited search of the vehicle was prompted by his safety concerns.
As noted in Bridges, supra, this court consistently has held that an officer’s observation of furtive movements during a traffic stop provides a sufficient basis for a protective Terry sweep of the vehicle. In this case, Sergeant Anderson testified that the driver of the Pontiac did not immediately pull over when he activated his lights and siren. Before the driver finally stopped the vehicle, he could see the passenger — Otis Lockett — making furtive movements and reaching back and over to his left. Taken together, the presence of both of these circumstances justified Sergeant Anderson’s action of opening the door to look |1fiinside the Pontiac. Once inside, he saw in plain view the handle of the gun that was in the unzipped lunch box. Both Otis Lockett and his nephew denied that there were any weapons in the vehicle. Their denial that there was a gun in the vehicle gave Sergeant Anderson probable cause to believe that the gun was evidence of a crime; hence, he lawfully could seize it. The district court did not err by denying the motion to suppress the evidence.
CONCLUSION
Sergeant Anderson lawfully stopped the vehicle in which Otis Lockett was riding as a passenger. Sergeant Anderson lawfully removed both the passenger, Otis Lockett, and the driver, Otis Lockett’s nephew, from the vehicle. Otis Lockett’s furtive movements coupled with his nephew’s (the driver’s) delay in stopping the vehicle allowed Sergeant Anderson to open the vehicle’s door and look around the interior. Upon looking inside, he saw in plain view the handle of the gun lying inside the unzipped lunch box. When both Otis Lockett and his nephew denied there was a gun in the vehicle, Sergeant Anderson had probable cause to believe that the gun was evidence of a crime and to lawfully seized it. The district court thus did not err by denying Otis Lockett’s motion to suppress the evidence. Accordingly, the defendant’s application for supervisory writ is denied, and the stay is lifted.
WRIT DENIED; STAY LIFTED
JENKINS, J., respectfully dissents and assigns reasons.

. On cross-examination, Sergeant Anderson testified that although the Pontiac had a cracked windshield, the reason he decided to stop the vehicle was because it was traveling at a very slow speed.

. Both were legal. Sergeant Anderson saw the vehicle impeding traffic as it proceeded very slowly down Canal Street in the left lane, causing other vehicles to drive around it. He also observed that the vehicle had a cracked windshield. Sergeant Anderson therefore was justified in stopping the car for the traffic violations. Pursuant to this lawful stop, he was allowed to order both the driver, Frederick Lockett, and the passenger, Otis Lockett, out of the car. See Maryland v. Wilson, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), and State v. Landry, 588 So.2d 345 (La.1991).

. This court addressed the automobile exception in State v. Anderson, 06-1031, p. 5 (La.App. 4 Cir. 1/17/07), 949 So.2d 544, 547-48, stating:
Pursuant to the "automobile exception”, there is no separate exigency requirement if there is probable cause to search a vehicle. U.S. v. Ross, 456 U.S. 798, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); see Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more.”); see also State v. Thompson, 2002-0333 (La.4/9/03), 842 So.2d 330 (if a vehicle is readily mobile, there is no difference between seizing the car while obtaining a search warrant and immediately searching the vehicle without a warrant). Thus, if there is probable cause to search and the vehicle is readily mobile, even if stationary at the time the search proceeded, any evidence will be considered constitutionally seized, (citations omitted.)

.The use of a light to illuminate the interior is not a search. See State v. Gervais, 546 So.2d 215, 218-19 (La.App. 4th Cir.1989).

. Although in Arizona v. Gant, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), the Supreme Court narrowed the scope of the exception for a search incident to an arrest, it expressly reaffirmed its holding in Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), authorizing a protective Terry sweep.